*Oard v. Muskegon County et al.*

Case No. 1:17-CV-1136

Exhibit A to Plaintiff's Response Regarding Privilege Issue

Deposition of Hon. Timothy Hicks



**CERTIFIED COPY**

**In the Matter Of:**

Vernon Oard vs County of Muskegon, et al.

**HONORABLE TIM HICKS**

*November 09, 2018*

*Job Number: 509211*



1            UNITED STATES DISTRICT COURT

2         FOR THE WESTERN DISTRICT OF MICHIGAN

3    ————————————————

4   VERNON OARD,

5       Plaintiff,

6   V                Case No:  1:17-CV-1136
                      HON. PAUL L. MALONEY

7

8   COUNTY OF MUSKEGON, and
   14TH JUDICIAL CIRCUIT COURT,

9       Defendant.

10  ————————————————

11

12

13

14      DEPOSITION OF HONORABLE TIM HICKS
   taken before Shawn M. Breimayer, Certified Shorthand Reporter,
15  at the Muskegon County Hall of Justice, 99 Terrace Street - 3rd
   Floor Conference Room, Muskegon, MI, Thursday, November 9, 2018
16  commencing at 10:05 a.m., pursuant to notice.

17  APPEARANCES:

18  FOR THE PLAINTIFF:  Sarah Riley Howard (P58531)
                   PINSKY, SMITH, FAYETTE, & KENNEDY LLP
19                 146 Monroe Center NW, Ste 805
                 Grand Rapids, MI 49503
20                 (616) 451-8496

21  FOR THE DEFENDANT:  Laura Bailey Brown (P79742)
                   SCHULTZ & JOPPICH, PC
22                 27555 Executive Dr, Ste 250
                 Farmington Hills, MI 48331
23                 (248) 489-4100

24
    Reported by:  Shawn M. Breimayer, CSR-6888
25  Job Number:   509211

Vernon Oard vs County of Muskegon, et al.
HONORABLE TIM HICKS - 11/09/2018

Page 2

1                    TABLE OF CONTENTS
2    WITNESSES:                                      PAGE
        HONORABLE TIM HICKS
3        (Direct Examination by Ms. Howard)           3
4
5
6
7
8
9
10
     EXHIBITS:                                    MARKED
11     (None marked)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1           (Deposition commenced at 10:05 a.m.)
2           H O N O R A B L E   T I M O T H Y   H I C K S
3    after having been first duly sworn to tell the truth, the whole
4    truth and nothing but the truth, testified upon his oath as
5    follows:
6           MS. HOWARD:  Good morning, your Honor.
7           THE WITNESS:  Good morning, Ms. Howard.
8           MS. HOWARD:  I'm Sarah Howard.  I represent the
9    plaintiff in this case, Vern Oard.
10          DIRECT EXAMINATION
11   BY MS. HOWARD:
12   Q.  Judge, have you been deposed before?
13   A.  No.
14   Q.  Well, we'll try to get through this as quickly as we
15       can.  What did you do to prepare for today's
16       deposition?
17   A.  Well, I talked to Ms. Brown.  I think I had
18       peripheral -- I had a couple conversations with Sandra
19       Vander Hyde.  It was mostly, do you want me to be here
20       or not be here.  That was it.  Judge Hoogstra mentioned
21       just a little bit about her deposition at the beginning
22       of our judge's meeting on Wednesday, and I kind of said
23       to her, I really don't want to talk about it and that
24       was it.  Doug Hughes stopped in this morning, and he's
25       the county attorney, and he just kind of said something

Page 4

1    about go like to your deposition and the memo I think
2    we'll probably talk about.  He said -- he didn't pass
3    it on to anybody, so that was about it.
4    Q.  Okay.  Did you review any documents in preparation for
5        today's deposition?
6    A.  No.
7    Q.  Okay.  Do you have a court issued cell phone?
8    A.  No.
9    Q.  Okay.
10   A.  I have a court issued iPad.
11   Q.  Okay.  Did you do any searching yourself for
12       potentially responsive documents to discovery requests
13       in this case?
14   A.  I haven't seen any discovery requests.  On my own I
15       went back through the County e-mail o see what Judge
16       Marietti and I might have had back and forth, and I
17       couldn't find anything.  But I'm not that tech savvy.
18   Q.  Understood.
19   A.  There might be a couple texts from me to Jill Stamison
20       on my personal phone.
21   Q.  Okay.
22   A.  But I couldn't find those either.  I didn't really look
23       very hard.
24   Q.  How old are you, Judge?
25   A.  66.  I was talking to Laura.  I said, this is a bucket

Page 5

1    list kind of thing.  I've never been deposed and I've
2    not never gotten legal advice from someone half my age,
3    so.
4    Q.  Excellent.  Now, you graduated from Cooley Law School,
5        correct?
6    A.  Yep.
7    Q.  And you also served as a law clerk for Robert Holmes
8        Bell, correct?
9    A.  In State Court.
10   Q.  In State Court?
11   A.  That's been an issue over the years people thought I
12       fabricated.  I was with him when he was in State Court.
13   Q.  That was district?
14   A.  I think Ham.
15   Q.  I think Ham Circuit Court?
16   A.  He was at the courthouse in Mason.  I had the corner
17       office.
18   Q.  And you were in private practice for thirteen years?
19   A.  Yes.
20   Q.  With what firm?
21   A.  Well, with Judge Bell.  I spent about two years up
22       north with a firm called Lyon & Hackett in Cheboygan.
23       I always wanted to practice in one of these small towns
24       where you could canoodle work and stuff like that, so
25       that was about two years.  And I came to Muskegon and

Vernon Oard vs County of Muskegon, et al.
HONORABLE TIM HICKS - 11/09/2018

**Page 6**

1  joined a firm, which was then called Parmeter Forsythe
2  & Rude. So I had six years with Parmeter, Forsythe &
3  rude, six or seven, and we merged with what was the
4  former O'Toole Johnson firm. So the merger created
5  what was then Parmeter O'Toole, so I mean, I was still
6  with the same Parmeter Forsythe people, but it was a
7  merged form.
8  Q.  And how long were you with Parmeter O'Toole?
9  A.  I believe we merged in '92 and I became a judge in '96,
10  so four years.
11  Q.  You were appointed to the bench by Governor Snyder?
12  A.  Yes.
13  Q.  And you've been reelected four times?
14  A.  Well, reelected is a goofy verb. '96 I was elected
15  that year. I wouldn't call it a reelection, because I
16  hadn't been elected before. So, '96, '98, 2004, 2010,
17  2016.
18  Q.  All right.
19  A.  So I had five elections, four reelections.
20  Q.  And you are a former president of the Michigan Judge's
21  Association, correct?
22  A.  I am. And then, you know, I had the officer jobs
23  before that. You work your way up treasurer,
24  secretary, stuff like that.
25  Q.  Now, currently you are on the general criminal, civil,

**Page 7**

1  and business court docket, correct?
2  A.  Yes. I'm going to be the drug court judge here in a
3  month.
4  Q.  Will you still be the business court judge then?
5  A.  I will.
6  Q.  Okay. Tell us what you do as the business court judge?
7  A.  My life hasn't changed that much since I became the
8  business court judge, really. I just handle it like --
9  I do all my other civil cases. Don't tell Judge Yates
10  this, but I'm even a little confused about what is a
11  business court case anymore. I mean, I've got about
12  three cases that I would call business court cases, but
13  I've always had them. I mean, before we separately
14  established the business court we always had regular
15  civil cases, so I've always had these kind of cases,
16  you know, I still have my, my foreclosures and now
17  student loan cases and stuff like that, so.
18  Q.  Have you ever been on the family court docket since
19  you've been on the bench?
20  A.  Yes. Well, when I started in '96 every circuit judge
21  had a little bit of everything, so everybody's docket
22  was pretty much the same allocation. So for those two
23  years I had some divorce cases. Now, I've never done
24  abuse and neglect or juvenile delinquency, but I had
25  divorce cases for my first two years. Then for awhile

**Page 8**

1  I had PPO's. The way we arranged it everybody had a
2  turn in the PPO barrel, so I actually had some PPO
3  responsibility until about 2010, probably.
4  Q.  You are chief judge pro tem correct?
5  A.  I am.
6  Q.  What does that mean?
7  A.  Around here we're pretty collegiate, it doesn't mean
8  much at all. We always talk to each other. Judge
9  Marietti and I talk to each other about management
10  issues, but I can't think of anything that I have ever
11  done as pro tem, per se, you know, where somebody says
12  you're pro tem, so do this.
13  Q.  Are you sort of the next in line to be chief judge at
14  the pro tem or?
15  A.  I suppose.
16  Q.  Okay. Are there rules here locally about how long
17  someone serves as the chief judge or is it a mere
18  election at a judge's meeting? How does that work?
19  A.  We've always been pretty collegial, so there's no
20  rules. In fact, we used to assiduously campaign
21  against it, you know. A few years ago the setup we
22  were supposed to give Lansing two names, and so, the
23  second name would call Lansing and say you need to
24  appoint the first guy, so.
25  Q.  So the State Court Administrator's office has some

**Page 9**

1  limited role in who is chief judge, but it's mostly
2  left to local discretion?
3  A.  I don't know that I would say that.
4  Q.  Okay.
5  A.  You know, I don't know for sure what the rule is right
6  now, to tell you the truth. I think they still want
7  two names, but then they pick the one they want.
8  Q.  Okay. How long has Chief Judge Marietti been the chief
9  judge?
10  A.  Chief judge?
11  Q.  Mm-hm.
12  A.  Since Judge Ruck retired, I think. So that was, I
13  think, six years ago. I was chief judge way back when.
14  I was chief judge from like '99 to 2002, I think.
15  Q.  What are some other responsibilities of the chief
16  judge?
17  A.  The chief judge?
18  Q.  Yes.
19  A.  He manages the court, he manages our meetings, he has
20  all kind of responsibilities under the Court Rule.
21  Q.  When you say manages meetings, you mean manages the
22  judge's meetings?
23  A.  The judge's meetings. You probably know this, our side
24  is that the four circuit court judges and the two
25  probate judges pretty much function as a unit, so. At

Vernon Oard vs County of Muskegon, et al.
HONORABLE TIM HICKS - 11/09/2018

Page 10

1  our particular meetings you couldn't tell who was what,
2  so the six of us meet together.  And so, the chief
3  judge, circuit judge typically runs those meetings.
4  You know, I think the chief judge is the final arbiter
5  on employment issues.  Chief judge goes to a lot of
6  meetings.  He represents us in front of the County
7  Board.
8  Q.  Just to talk a little bit about the relationship
9      between the County of Muskegon and the Court.  So the
10     County is the funding agent for the circuit court,
11     correct?
12 A.  Yes.
13 Q.  And the Court relies on the County for certain types of
14     functions like some human resources functions, would
15     you agree?
16 A.  Yes.
17 Q.  Are some of the Court's human resources functions
18     performed by Ms. Vander Hyde as the Court
19     Administrator?
20 A.  Sure.
21 Q.  What's the difference between what's done by Ms. Vander
22     Hyde and what's done by County HR?
23 A.  I couldn't tell you the detail.
24 Q.  Okay.  Does authorization for new court employees or
25     new positions have to come from the County, for

Page 11

1      example?
2  A.  I really don't know.  I think they have to sign on, but
3      typically, we would talk to Sandra and she would talk
4      to the County HR.
5  Q.  Okay.
6  A.  For example, we were looking for a new, you would call
7      her a law clerk, we call her a research attorney, about
8      a year ago, and we were having some trouble.  We
9      weren't getting a good pool of applicants, so we said
10     we need to get more money for this.  So we talked to
11     Sandra, Sandra talked to HR, and HR said fine, so
12     that's kind of the way I've done it.
13 Q.  When say County, you mean County HR?
14 A.  County HR, yeah.  You know, so those kind of things
15     were small enough, we're pretty collegial, so I mean,
16     we don't have a rigid hierarchal structure, you know, I
17     don't have to worry about Judge Marietti saying you
18     should have talked to me about that before you talked
19     to Sandra.  I get on the phone and I talk to Sandra.
20 Q.  Now, before the transition from Juvenile Transition
21     Center being under the auspices of the County and now
22     being under the auspices of the Court, what
23     relationship did the judges have with the Juvenile
24     Transition Center?
25 A.  I really don't know.  Sounds bad.  I'm sure you're

Page 12

1  prepared.  You've done your homework.  When I was a new
2  judge I was on the fourth floor, and when I was
3  there -- so then, this means this lawsuit had to happen
4  before 1997.  And so, I had a case where a young man, I
5  think, committed suicide and then his family sued.  He
6  was at the Youth Home.  And one of the parts of the
7  case was the claim that he committed suicide because he
8  was afraid of going back to the old Youth Home out on
9  White Lake Drive.
10     And so, I presided over the case and I had a
11 whole bunch of witnesses, and at that point, I think
12 the County did it and the judges were trying very hard
13 to keep hands off.  And in fact, I think one of the --
14 one of the probate judges said something about we
15 didn't know, we figured as long as the State kept us
16 open we were okay.  So I'm not trying to be flippant,
17 so I don't know, you know, what the relationship right
18 now of the judges is with the current JTC.
19 Q.  Is it fair to say that the family court judges might
20     have a closer day-to-day working relationship or more
21     involvement, at least, with the JTC?
22 A.  Yes, yes.  We have our judges meetings, I'm always
23     respectful.  I never bring my cell phone.  But when we
24     talk about family division stuff I kind of tune out.  I
25     don't understand it, I don't know the people.  I've got

Page 13

1  a pretty full plate anyway.  In fact, sometimes,
2  depending on the meeting, we'll arrange the meeting to
3  do the family court stuff at the end, so that when it
4  doesn't concern me I just leave.
5  Q.  Understood.  Have you -- the JTC, that is a jail
6      facility, though, correct?
7  A.  It looks like it to me.  There's barbed wire and stuff.
8      I've never been inside it.
9  Q.  Okay.  Your Honor, did Judge Hoogstra ever discuss
10     concerns that she had with you about Eric Stevens and
11     his relationships with Kelly France and Lindsay Nelson?
12 A.  I don't recall her discussing this with me prior to all
13     this stuff happening.  Since all this stuff happening,
14     yes, she stopped in a couple times and discussed her
15     concerns.
16 Q.  Okay.  So when we say all this stuff happening, what
17     date, approximately, are we talking about or what
18     event?
19 A.  For me it happened, it happened in March of 2017.
20 Q.  And what happened in March 2017?
21 A.  Well, I was on vacation and somebody said Jill Stamison
22     had stopped in and just wanted to say hello.  She was
23     leaving County employment and wanted to say good-bye or
24     something like that.
25 Q.  And what was Ms. Stamison's position?

Vernon Oard vs County of Muskegon, et al.
HONORABLE TIM HICKS - 11/09/2018

Page 14

1  A.  I think -- well, she worked for the family court and
2      she worked for a unit of about three people, I think,
3      and I guess they were like the counselors.  I don't
4      think she did probation, but I know that she met with
5      clients and she tried to settle disputes and things
6      like that, I thought.
7  Q.  And Ms. Stamison left some kind of message for you
8      after she resigned during your vacation?
9  A.  What I recall is she just -- she was leaving and she
10     just wanted to say good-bye, so.
11 Q.  So did you reach out to her at that point?
12 A.  I did when I got back.
13 Q.  What did she tell you?
14         MS. BROWN:  I think you can talk about your
15     conversations with Jill.
16         THE WITNESS:  Well, one thing I want you to know
17     is that Jill and I had a relationship before she
18     started working for the Court.  It's kind of
19     interesting.  I actually met her husband, who is a
20     colorful guy, who used to be in the Olympics.  And so,
21     I did a few things with her husband, canoeing and stuff
22     like that, and so, I first met Jill when she was in my
23     court one day.  She was like a counselor for, I think,
24     one of the hospitals and she was interested in one
25     of -- her clients was one of my defendants.  And so,

Page 15

1      and my court officer, as I sometimes do, bring her in
2      afterward and say thanks for the work you do, you guys
3      are down in the trenches while I'm downtown giving
4      orders.  She said well, you know my kids.  I said what,
5      and it turned out that she was Paul's former spouse.
6      So she and I had, sort of had a connection like that
7      before she started working for the County.
8         So what did she say to me, we had lunch, and she
9      said that she was leaving because she was unhappy and
10     that was the same reason that I think the two people
11     she worked with were leaving.  And why are you unhappy,
12     so it kind of got going on stuff.
13 BY MS. HOWARD:
14 Q.  So the two of you had lunch to discuss this issue?
15 A.  We had lunch just to say hey, good luck and keep me
16     posted.
17 Q.  And what did she tell you during this lunch?
18         MS. BROWN:  So, to be clear, I think these
19     factual questions are fine and you can answer these
20     questions and I will let you know.
21         THE WITNESS:  Okay, I'm just going to go and,
22     you know, punch me or something like that.  She said
23     Eric was having personal relationships with some
24     people.
25 BY MS. HOWARD:

Page 16

1  Q.  Did she tell you who?
2  A.  Yeah, she said -- this was the first of a couple
3      conversations, so you've got to give me a little bit
4      of -- but she said Lindsay Nelson and Kelly France, and
5      she said they had a consensual relationship when they
6      were both single with one of our longtime employees,
7      Luanne Kendrick Wood, I think.  I don't know what
8      Luanne's name is now.  She said that was awhile ago and
9      they were both single and consensual, but I think
10     that's it.  We have an accounting lady who is really
11     wonderful, Jennifer O'Neil, who kind of wanted to
12     connect with Eric, but she said nothing ever happened
13     with that.
14 Q.  How do I spell O'Neil?
15 A.  O-'-N-e-i-l, I think.
16 Q.  And you said Ms. O'Neil wanted to connect with Eric,
17     you meant have a romantic relationship with him?
18         MS. BROWN:  Objection to the form and
19     foundation.
20         THE WITNESS:  So answer it?
21         MS. BROWN:  Yeah.
22         THE WITNESS:  She just felt like Jennifer was
23     kind of lonely.  That's all.
24 BY MS. HOWARD:
25 Q.  What did Ms. Stamison tell you about the impact she

Page 17

1      felt Mr. Stevens' romantic relationships with Ms.
2      Nelson and Ms. France are having on the workplace?
3  A.  Well, it was demoralizing, because it was separate sets
4      of rules for people that Eric favored and another
5      separate rules for other folks.  And for her people,
6      all three of them she named, her and Jordan and Wayne,
7      I think, you know, that was the primary reason they
8      were leaving.  None of them specifically.  She did not
9      say Eric had harassed any of them or her, but that was
10     one of the reasons she said they were getting out of
11     here.  It was just a demoralizing workplace.
12 Q.  Okay.  That was Jordan Havens and Wayne Seller?
13 A.  Yeah, I think so.
14 Q.  Okay.  And did she tell you she felt Mr. Stevens had
15     removed some of her duties or changed her conditions of
16     employment because she had complained about his
17     relationships with Ms. Nelson or Ms. France?
18 A.  You know, I don't specifically remember that.  I mean,
19     I don't know that her job title ever changed, but she
20     could have said that.
21 Q.  Okay.  Prior to this learning this information from Ms.
22     Stamison, did you -- had you known or heard that Mr.
23     Stevens had had romantic relationships with Kelly
24     France and Ms. Nelson?
25 A.  No, I was stunned.

Vernon Oard vs County of Muskegon, et al.
HONORABLE TIM HICKS - 11/09/2018

Page 18

1  Q.  Okay.  When you said that you and Ms. Stamison had a
2      relationship before she was with the Court, do you mean
3      a romantic relationship or just a friendly
4      relationship?
5  A.  Just friendly, a professional friendly.  In fact, I
6      don't think I've saw her outside this building.
7  Q.  Okay.
8  A.  Like I said, I did a couple things with her former
9      spouse, but never -- so no, it was totally
10     professional.
11 Q.  Okay.  Now, in response to learning this information
12     from Ms. Stamison, what did you do?
13 A.  Well, I think I started writing it down, and then, then
14     I talked to Sandra Vander Hyde almost right away.
15 Q.  What did you discuss with Ms. Vander Hyde?
16 A.  Well, the first thing I did was I wanted to be sure
17     that Jill was a neutral, fair reporter.  And whether
18     Jill was a bad egg, bad actor or whether Jill had a
19     romantic connection with Eric, and Sandra gave Jill
20     passing grades on all that stuff.  Then I talked to
21     Sandra about how much of this is true.  I kind of asked
22     her to corroborate some of it, and she kind of said it
23     was, she did say it was.
24 Q.  All right.  So what did you do after having that
25     discussion with Ms. Vander Hyde?

Page 19

1  A.  I kept writing it down.  I think then I called Lansing
2      for advice, the State Court offices.
3  Q.  The State Court Administrator's office?
4  A.  Yes.
5  Q.  Who did you speak to there?
6         MS. BROWN:  So to the -- I think we're kind of
7      encroaching on the subject of, you say writing it down,
8      the memo.
9         THE WITNESS:  Yeah, I'm taking continual notes
10     by now.
11        MS. BROWN:  So now -- and we've already objected
12     to producing that, and that's clear in discovery.  And
13     I also want to lodge, for the record, an objection to
14     getting into specific details about conversations that
15     Judge Hicks may have had with the SCAO or with other
16     attorneys or any kind of conversations that were had in
17     the pursuit of legal advice for various legal matters
18     that may have come up as a result of the factual
19     discussions that we were just having on the record.
20     So, for the record, I wanted to state that objection.
21     Subject to that objection, you may answer.
22        THE WITNESS:  I talked to Ed Zobek.
23 BY MS. HOWARD:
24 Q.  How do I spell Zobek?
25 A.  Z-o-b-e-k.  And if you depose him he's going to hate me

Page 20

1      forever.
2  Q.  And what is Mr. Zobek's position?
3  A.  I think he's head of HR for the Supreme Court.  I knew
4      he's an HR guy.  I think he's the boss.
5  Q.  And so, you spoke to Mr. Zobek about this matter?
6  A.  Yeah.
7  Q.  Why did you feel this was an issue you needed to
8      investigate further?
9  A.  I wanted advice.  In all the work I've done I know
10     these kind of things have a potential to be pretty
11     disruptive for the Court.  I wanted to make sure I was
12     on the right track before I went further down the road.
13 Q.  All right.  And what did you and Mr. Zobek discuss?
14        MS. BROWN:  I'm going to object here on the
15     basis of attorney work product, attorney client
16     communications, and also, deliberative process
17     privilege.  And to the extent you're seeking advice on
18     an investigation relating to employee and potential
19     legal action, I would instruct you not to respond to
20     that question.
21 BY MS. HOWARD:
22 Q.  Judge Hicks, is Mr. Zobek an attorney?
23 A.  I don't think so.
24 Q.  Did you and Mr. Zobek consult an attorney during your
25     discussions?

Page 21

1  A.  No.  Just the two of us were there on this
2      conversation, phone call.
3  Q.  In your mind, what was the purpose for calling Mr.
4      Zobek?
5  A.  Well, I think I just told you, I mean, by now I'm
6      concerned about probably four or five different
7      problems, and I just wanted some confirmation before I
8      kept pushing along.
9  Q.  All right.  But as a HR professional, was your purpose
10     in calling Mr. Zobek sorting out the disruption issues
11     and the employee relations issues?
12 A.  Well, I've known Ed for awhile.  By now I'm kind of
13     worried, so it was a pretty wide ranging discussion.
14     It wasn't, you know, one, two, tree, four, five bullet
15     points, but yeah, there were several ramifications I
16     was concerned about, some management, some legal, you
17     know.
18 Q.  Up to this point, had you talked with any of the other
19     judges about the situation?
20 A.  No.
21 Q.  Okay.  Why not?
22 A.  Well, I wanted to be sure I had my ducks in a row
23     before I did that.
24 Q.  Did you have any --
25 A.  This was the kind of thing that I wanted to be as

Vernon Oard vs County of Muskegon, et al.
HONORABLE TIM HICKS - 11/09/2018

Page 22

1   precise as I could before we went any further.  I
2   didn't want to do this halfway.  I didn't want to blur
3   the lines of communications or things like that.
4   Q.  Okay.  Up to this point, had you had any discussions
5   with Mr. Stevens about this issue?
6   A.  No.
7   Q.  All right.
8   A.  I can tell you this, I've never had any discussions
9   with Mr. Stevens ever again really, any private ones, I
10  don't think.  We were in judge's meetings together a
11  couple times.
12  Q.  So, at this point, you've talked to Mr. Zobek, then
13  what happens next in your fact finding?
14  A.  Well, I keep fact finding and then I went to Judge
15  Marietti and I said hey, I think we've got a problem.
16  Q.  And what else did you and Judge Marietti discuss when
17  you had this discussion?
18  A.  We discussed all this.  We discussed a little bit about
19  what he knew about it, what he had done and stuff like
20  that.
21  Q.  What did Judge Marietti tell you that you that he knew
22  about it and had done?
23      THE WITNESS:  Answer it?
24      MS. BROWN:  Yes you can answer that.
25      THE WITNESS:  Well, he, he was a chief judge,

Page 23

1   and the timing here is going to be a little bit weird,
2   but he had had an inkling of some of this previously,
3   he told me, and I think he had -- there were two
4   things, I thought he had involved Judge Hoogstra a
5   little bit in it and then he talked to Eric about it,
6   and then, he thought the problem was solved.  And it's
7   interesting, it was -- I don't know which year it was,
8   but I know that in -- he apparently had talked to
9   Sandra about it, because -- we had an annual Bar
10  Association steak fry, and I think at the steak fry
11  Judge Marietti had told Sandra that he thought, you
12  know, we could handle it and the problem was solved or
13  gone away or something like that.
14  BY MS. HOWARD:
15  Q.  Okay.  Did Judge Marietti tell you that he thought it
16  was true that Mr. Stevens was, in fact, having or had
17  had romantic affairs with both Ms. France and Ms.
18  Nelson?
19  A.  He did not think it was true.
20  Q.  Did he tell you why he did not think it was true?
21      MS. BROWN:  So to the -- I just want to lodge an
22  objection for the record.  To the extent that you had
23  deliberative discussions about the process and any kind
24  of investigation into Eric Stevens with Judge Marietti
25  and or attorneys also involved in these investigations,

Page 24

1   I'm just going to ask that you keep your answers to the
2   factual discussions that have been and object to, or I
3   instruct you not to answer anything that would be
4   subject to those objections that I just made.
5      THE WITNESS:  Thanks.
6      MS. BROWN:  Which are probably confusing.
7      THE WITNESS:  Well, let me see if I can try it
8   this way, at this point, there are at least four
9   different things here.  There is what's the effect on
10  the administration of the Court.  There's the theme of
11  what's the effect on the employees with whom Eric may
12  have had a direct romantic relationship.
13      There is the litigation part like hey, are we
14  going -- as a Court going to be sued or have problems
15  like this because of these various things.  And by that
16  point, there's the specter of personal liability for
17  judges, because, you know, I mean, I don't have to tell
18  you this, but if -- these are management personnel
19  issues, and so, there's some argument that the rules
20  change for judges when you do that.
21      This is not like me making a decision in a
22  courtroom, as you know.  So that that's where we are,
23  we're talking about all those things, you know, and
24  Judge Marietti thought that we had taken care of it.
25  He had specifically directed Eric, he said well, Eric,

Page 25

1   if these things aren't true, then you have a perception
2   problem that you need to address.  And then, Eric came
3   back and said, fixed.
4   BY MS. HOWARD:
5   Q.  Okay.  Did you and Judge Marietti discuss -- what else
6   did you discuss in your conversation with him about
7   your fact finding?
8      THE WITNESS:  Okay?
9      MS. BROWN:  Yes, about the fact finding.
10     THE WITNESS:  Well, I pushed.
11  BY MS. HOWARD:
12  Q.  What do you mean by that, your Honor?
13  A.  I pushed him.  I said I don't think we can stop at
14  that.  I think I remember telling him at one point that
15  this is like you're going to the embezzling controller
16  who tells you everything is okay.  I said, I think we
17  got to go farther, we've got to ask questions, we
18  probably have -- that's maybe another theme, involve
19  the County counsel in this one, I think.
20  Q.  So what was Judge Marietti's response to that?
21  A.  He said yeah, that's what we got to do.
22  Q.  All right.  So then, what did the two of you do?
23  A.  Well, I probably, you know, I probably talked to Jill a
24  couple more times on the phone.  I don't think we ever
25  talked face-to-face during this time, and, you know, I

Vernon Oard vs County of Muskegon, et al.
HONORABLE TIM HICKS - 11/09/2018

Page 26

1  kind of felt that, you know, she had sort of started
2  the ball rolling with me, so I wanted to keep her in
3  the loop.  So I did that.  I talked to Sandra a couple
4  more times, and most of those are like are you sure
5  about this, and what about this, that kind of thing.
6  They asked me -- they thought I should talk to one
7  other person during this time, so I talked to Holly
8  Liefer, L-i-e-f-e-r, which is one of our probation
9  agents.
10         Holly's involvement, she was not a participant
11  in this.  Her involvement was, like she had seen,
12  allegedly, Eric out with both Kelly and Lindsay
13  together at some point.  So there's something about
14  that, and I don't know too much more about Holly.
15  Holly confirmed some of it, but she didn't confirm the
16  more, you know, anything really racy or anything.  So
17  I'm still writing this up, and I think Judge Marietti
18  said well, we need to get Doug Hughes involved.
19  Q.  Who is Doug Hughes, your Honor?
20  A.  Doug Hughes is the county lawyer.  He's right over
21  here.  He's at Williams Hughes and whatever their firm
22  name is.
23  Q.  All right.  So, just to follow up on a couple things
24  you said.  What specifically did Ms. Liefer tell you
25  when you spoke with her?

Page 27

1  A.  You know, I haven't looked at my memo to refresh.  I
2  don't know.  It wasn't -- it wasn't dynamite.  It was
3  kind of like they were at the bar together, but it
4  wasn't then, and they -- there were some claim that
5  somebody's husband had come in and grabbed her out of
6  the bar, and Holly said it wasn't like that.  That's
7  the best I can remember.
8  Q.  Okay.  But there was some, at least some degree of
9  incident that Ms. Liefer witnessed that involving Eric,
10  Ms. France and or Ms. Nelson?
11  A.  I think.  Just the one, as I recall.
12  Q.  Your Honor, if you were to review the memo that you
13  wrote, would that refresh your recollection about those
14  events?
15         THE WITNESS:  Do you want me to answer that?
16         MS. BROWN:  Sure.
17         THE WITNESS:  Sure, probably.
18  BY MS. HOWARD:
19  Q.  I want to back up for a second.  I forgot to ask you,
20  you said that when you were discussing this initially
21  with Chief Judge Marietti he had mentioned that he had
22  some involvement or discussion with Judge Hoogstra on
23  the issue, do you recall what he said about that?
24  A.  No, not in detail.  I think that he felt that, you
25  know, we're very -- of our six person unit, I think

Page 28

1  we're all sensitive to the fact that the three people
2  in titled positions are all men and there's three
3  people who are not, like chief judge, chief judge pro
4  tem, and presiding judge of the family division.
5  Q.  That would be Judge Pittman?
6  A.  That would be Judge Pittman, so we're all men, you
7  know, and I think we're all very sensitive to.  In
8  fact, for the last -- these are two year terms.  For
9  the last two terms I have had a standing offer to quit
10  being chief judge pro tem, but to get a little more
11  diversity.  But they never accepted my offer.
12         So I think he felt that with Judge Hoogstra
13  involved at least we had some female perspective that
14  would be helpful.  You know, and I don't think, I don't
15  think Judge Pratter had been elected yet, so it was
16  Judge Mullally then.  So it was -- we had Judge
17  Hoogstra and Judge Smedley for females.
18  Q.  Okay.  So you and chef Judge Marietti went to Doug
19  Hughes?
20  A.  He came to Bill's chambers.
21  Q.  And when you say Bill, you mean Chief Judge Marietti,
22  for the record?
23  A.  I'm sorry.
24  Q.  I just want to make sure we're talking about the same
25  person?

Page 29

1  A.  I'm trying to of, in some way you don't have to say
2  your Honor every time you're asking me these questions.
3  I guess Tim is a little too informal.
4  Q.  It's going to be hard to beat that out of me, your
5  Honor, so I'll do my best.  So you attained legal
6  advice from Mr. Hughes?
7  A.  Yeah, yes, yes.
8  Q.  Okay.
9  A.  Well, I mean, the conversation was like --
10         MS. BROWN:  Let's not talk about the
11  conversation with corporation counsel.
12         THE WITNESS:  Yeah, fair enough.
13  BY MS. HOWARD:
14  Q.  And Mr. Hughes represents the County?
15  A.  Yes.  His office has represented us in other types of
16  litigation.  We don't get involved in insurance when
17  prisoners sue us, things like that.
18  Q.  And when you said Mr. Hughes has represented us in the
19  past, you mean Mr. Hughes has represented the 14th
20  Circuit Court?
21  A.  And me and a few other judges.
22  Q.  So was Mr. Hughes, as far as you were concerned, acting
23  as a lawyer for the County?
24  A.  Oh, for sure.
25  Q.  When you spoke to him?

Vernon Oard vs County of Muskegon, et al.
HONORABLE TIM HICKS - 11/09/2018

Page 30

1    A.  Yeah, yeah.

2    Q.  Okay.  And approximately when was that?

3    A.  This is in, probably June 2017.

4    Q.  Of 2017?

5    A.  Yeah, I mean, I think things were moving pretty quickly

6        here.

7    Q.  Okay.  And what happened, did anything happen like in

8        initiation of an investigation as a result of your

9        discussion with Mr. Hughes?

10   A.  Yes, I think Doug's office undertook an investigation.

11   Q.  All right.  And who provided direction as to the scope

12       of that action to the Hughes firm?

13   A.  Judge Marietti.

14           MS. BROWN:  Objection.  Form and foundation.

15           THE WITNESS:  Sorry.

16           MS. BROWN:  That's okay.

17   BY MS. HOWARD:

18   Q.  Did you have any input into that investigation?

19   A.  No.  I was trying to kind of hand it off and get out of

20       dodge.

21   Q.  Okay.  So were you interviewed for the investigation

22       that was conducted?

23   A.  No.

24   Q.  Did you produce any documents to Ms. Franklin, the

25       attorney who conducted the investigation?

Page 31

1    A.  I have just the one document you guys already talked

2        about.

3    Q.  And that was the memo you wrote to Judge Marietti?

4    A.  Yeah.  And we gave that to Doug at that meeting.

5    Q.  Okay.  And did that memo contain both fact recitation,

6        as well as other types of questions about legal issues?

7            MS. BROWN:  And I'm going to object.  We have

8        objected to producing the memo as attorney client,

9        attorney work product, and also, deliberative processes

10       privilege, so any of the contents of the memo, I

11       believe, are subject to that objection.  And I'm going

12       to instruct you not to answer any questions about the

13       contents of the memo.

14           MS. HOWARD:  I think we probably need to discuss

15       this, but we can wait until we're done with the

16       questioning.

17           MS. BROWN:  That's fine.

18           THE WITNESS:  Let me see if I can help you here.

19           MS. HOWARD:  Okay, we'll go off the record for a

20       break.

21           (Off the record at 10:44 a.m.)

22           (Back on the record at 10:46 a.m.)

23           MS. BROWN:  Subject to the objection I made

24       before, you can answer.

25           THE WITNESS:  The memo had everything.  My

Page 32

1        thought process, my concern about the legal stuff,

2        facts, yes, you know, thoughts about all the things I

3        already told you.

4    BY MS. HOWARD:

5    Q.  Okay.

6    A.  It was all in the one memo.

7    Q.  Okay.

8    A.  Worry, you know.

9    Q.  Understood.  During the investigation, were you aware

10       that Chief Judge Marietti confiscated Mr. Stevens'

11       County issued cell phone?

12   A.  Probably.  Once, once Judge Marietti got involved with

13       Doug and all that stuff I really stepped back.  I knew

14       that Sandra Franklin was doing interviews.  I don't

15       know much about what happened with those interviews,

16       you know, stuff like that.

17           MS. BROWN:  Did you mean Susan Franklin?

18           THE WITNESS:  Susan Franklin, yeah, sorry.

19       Thank you.  Judge Marietti, every once in awhile, would

20       say well, here's what we've done, and I would just kind

21       of say okay.

22   BY MS. HOWARD:

23   Q.  Were those updates from Chief Judge Marietti at judge's

24       meetings or more informally?

25   A.  In the beginning they were very informal.  He'd just

Page 33

1        come down and say here's what I got and here's what

2        we're doing.

3    Q.  At some point, did -- was there discussion at the

4        judge's meetings about the results of the

5        investigation?

6    A.  Yes.

7    Q.  And was that before or after Chief Judge Marietti

8        notified Mr. Stevens that there was an investigation

9        being done?

10   A.  I would presume it was after, but I don't know.

11   Q.  Did Chief Judge Marietti tell you anything about his

12       discussion with Mr. Stevens, where he told Mr. Stevens

13       that the Court was doing an investigation and

14       confiscated his cell phone?

15   A.  I don't think so.

16   Q.  Okay.

17   A.  I mean, he, he -- Judge Marietti told me about his --

18       the earlier discussion with Eric, where he said well,

19       if you don't have a problem, then you better fix it,

20       because there's a perception that you have a problem.

21       So there's that.  I don't remember much after that.

22   Q.  All right.  Did you ever learn that Mr. Stevens

23       admitted to Chief Judge Marietti that he had lied and

24       was, in fact, having a sexual relationship with

25       Ms. France at the time?

Vernon Oard vs County of Muskegon, et al.
HONORABLE TIM HICKS - 11/09/2018

Page 34

1  A. Well, we have two women here, yes, Judge Marietti told
2     me that Eric admitted that he lied.
3  Q. And what did Chief Judge Marietti tell you Eric
4     admitted he lied about?
5  A. Having a sexual relationship, probably with Ms. France.
6     I couldn't tell you for sure if both ladies or just
7     one.
8  Q. Okay. But at least with one of them?
9  A. Oh, yeah, yeah, it was big deal, you know, that when
10    Eric came back and had admitted that he lied. That was
11    crossing the river.
12 Q. Yes. This might be obvious, but for the record, why
13    was that concerning to Chief Judge Marietti and to you?
14       MS. BROWN: Objection. Form and foundation.
15       You can answer.
16       THE WITNESS: Well, it -- why was it concerning?
17 BY MS. HOWARD:
18 Q. Yes.
19 A. Well, we -- I hate to say crossed the river, but we had
20    confirmation now about some of these very, very
21    disturbing things. And it wasn't possible or maybe or
22    things like it was a confirmation, so at that point, I
23    think the game changed.
24 Q. Were you there when Chief Judge Marietti talked with
25    Mr. Stevens about Mr. Stevens' tendering his

Page 35

1     resignation as the Circuit Court Administrator?
2  A. No.
3  Q. What did Chief Judge Marietti tell you about that
4     discussion?
5  A. I think he came down and he said Eric admitted -- I
6     don't know if it was the same time or not, but he said
7     Eric resigned, and I was very pleased about that.
8  Q. Why is that, your Honor?
9  A. Well, because his resignation eliminated several
10    painful steps that we might have had to do.
11 Q. Like what, your Honor?
12 A. Further investigation, further interviews, things like
13    that.
14 Q. All right. Was there any concern at that point --
15 A. I mean, it also shortened, you know, the whole process.
16 Q. Was there any concern at that point that any decisions
17    that Mr. Stevens had made or participated in might have
18    to be undone?
19 A. Nobody said that to me.
20 Q. Okay. Did Chief Judge Marietti tell you anything about
21    advising Mr. Stevens to take 24 hours to think about it
22    before he submitted his resignation?
23 A. He might have said that.
24 Q. Okay. And what did the two of you discuss about that?
25 A. I said okay. I didn't question it or fight back or

Page 36

1     push back. I said okay.
2  Q. Did you feel it was appropriate to offer Mr. Stevens 24
3     hours to think about his resignation?
4  A. When he told me that I was not offended, because we
5     still had options. 24 hours later if he chose not to
6     resign, then we could still go forward.
7  Q. Go forward with what, your Honor?
8  A. Investigations and that and possible disciplinary
9     action.
10 Q. Okay. Of Mr. Stevens?
11 A. Yes. We weren't giving anything up by giving him 24
12    hours and I didn't see any immediate harm for the 24
13    hours, so when he told me that I didn't say oh, my
14    gosh.
15 Q. When you learned that Mr. Stevens had lied and, in
16    fact, had been having a sexual affair with at least one
17    of the two women we talked about earlier, did you feel
18    that Mr. Stevens' termination of employment might be an
19    appropriate end?
20 A. An appropriate?
21 Q. Yeah.
22 A. Yes, certainly. Yeah, there was no going back on that.
23 Q. I want to talk for a moment about the awarding of the
24    position of superintendent and director of the Juvenile
25    Transition Center to Lindsay Nelson. Did you have any

Page 37

1     involvement in the decision to make Ms. Nelson the
2     interim superintendent and director of the JTC once the
3     JTC came under court jurisdiction?
4  A. No.
5  Q. Did you have any discussions with anyone who did make
6     that decision?
7  A. Anybody who made that, no.
8  Q. Okay. Did -- are you part of the e-mail group family
9     court all, do you get e-mails that go to anyone in that
10    e-mail group?
11 A. No. I think I met Mr. Oard one time ever.
12 Q. Okay.
13 A. My whole life at Subway one day for lunch. I mean, I
14    didn't meet him for lunch. We were standing in line.
15    I said I'm Tim Hicks and I think he said I'm Vern Oard,
16    and that's it.
17 Q. All right. Did you have any involvement in the
18    selection of Ms. Nelson for the permanent position of
19    superintendent and director of the JTC?
20 A. No.
21 Q. When you learned that Mr. Stevens may have been having
22    a sexual relationship at one point with Ms. Nelson, did
23    you find that having her in a superintendent and
24    director role at the JTC was inappropriate or should be
25    investigated further?

Vernon Oard vs County of Muskegon, et al.
HONORABLE TIM HICKS - 11/09/2018

Page 38

1 A. Jill was concerned about that, and I was just going to
2   trust my other colleagues who were involved in this to
3   make the right decision. I knew from, from talking at
4   judge's meetings that there was some unhappiness with
5   Mr. Oard's performance. I don't know the details of
6   that, but I knew that and I knew that there was some
7   unhappiness with his performance.
8 Q. Well, let's unpack that a little bit. How many judges
9   would you say the issue of Mr. Oard's performance came
10  up?
11 A. We meet kind of monthly. I only remember one. It
12  could have been more than.
13 Q. And what do you remember --
14 A. You know, the other thing, sometimes there might have
15  been, you know, some talk about it without any formal
16  discussion.
17 Q. Okay.
18 A. But I would say no more than two. I don't remember it
19  as a continuing, you know, saga or anything.
20 Q. All right. Well, on the two or so occasions where you
21  may have heard negative things about Mr. Oard's
22  performance, what did you hear and who did you hear it
23  from?
24 A. I couldn't tell you. Just wasn't getting the job done,
25  just general stuff like that. I don't remember

Page 39

1   anything more specific than that. I don't remember any
2   claims that he was physically abusive or embezzling
3   money, that just his performance was not meeting
4   expectations.
5 Q. Did you ever hear that from Mr. Stevens?
6 A. He was in those meetings, so he could have said that.
7 Q. Okay.
8 A. You know, but I think that my recollection is that that
9   opinion was endorsed by a couple of the judges, too.
10 Q. Okay. Which judges?
11 A. I think Judge Pittman agreed and I think -- I guess I
12  don't know what Judge Marietti said, but I've known --
13  I thought Judge Pittman agreed with that, yeah, it was
14  just kind of like not getting the job done or.
15 Q. Besides Judge Pittman, any other judges that you
16  thought endorsed the idea that my client wasn't getting
17  the job done?
18 A. Well, I think there was no pushback on that. I'm
19  trying to think who was there. I think Judge Marietti
20  kind of agreed, but I can't remember what he said. We
21  had Judge Mullally, Judge Marietti, me, Judge Smedley,
22  I don't think we had an opinion, and Judge Hoogstra.
23  So that was kind of our group at that point.
24 Q. So, as far as you can remember, the only judges that
25  you can remember commenting that my client, something

Page 40

1   along the lines of wasn't getting the job done would be
2   Judge Pittman and possibly Judge Marietti?
3 A. Yes.
4 Q. And you don't remember any other further specifics
5   besides not getting the job done?
6 A. I don't. Eric would have been the one to report that,
7   and I honestly don't remember, like I said, I was --
8   for the family division stuff I don't know most of the
9   people, so I just sort look at the other agenda items
10  when they do this stuff.
11 Q. Do you think it's possible that Mr. Stevens' current or
12  past relationship with Ms. Nelson could have had any
13  impact on Mr. Oard's performance?
14     MS. BROWN: Objection. Form and foundation.
15     THE WITNESS: Is it possible, sure.
16 BY MS. HOWARD:
17 Q. Did you participate in any way with the selection of
18  Ms. Nelson as the permanent superintendant and director
19  of the JTC?
20 A. No.
21 Q. Did you speak with anyone about the process that was
22  used to select the permanent recipient of that job,
23  either before or after Ms. Nelson's selection?
24 A. Well, I talked to Ms. Stamison, and I've already --
25  that's pretty much already been covered. I talked to

Page 41

1   Sandra and I think I talked to Judge Hoogstra at that
2   point, you know, after, because, you know, she wasn't
3   happy with it.
4 Q. What did Judge Hoogstra tell you?
5 A. Well, my understanding was that --
6     THE WITNESS: Go ahead?
7     MS. BROWN: Yes.
8     THE WITNESS: My understanding it was a two tier
9   process, there was one committee and another committee.
10  And so, my understanding from the -- from Judge
11  Marietti was that it was always set up that way to do
12  it as a two tier process, and I think Ms. Stamison and
13  Judge Hoogstra felt that it wasn't always set up like
14  that, but that they had somehow finagled this second
15  group to rig it so that Ms. Nelson would get the job.
16 BY MS. HOWARD:
17 Q. All right. And what did Judge Hoogstra tell you
18  anything else about the process that she felt was
19  unfair to rig it in Ms. Nelson's favor?
20 A. Just that. I think she was on the first group and she
21  wasn't on the second one and someone else wasn't on the
22  second one, and she felt that was unfair and that was
23  an attempt by Eric, I guess, to rig the system. Maybe
24  you're going to ask this, but let me tell you how out
25  of the loop I am, it must have been at about this time

Vernon Oard vs County of Muskegon, et al.
HONORABLE TIM HICKS - 11/09/2018

Page 42

1  Eric sat right over here at the judge's meeting, he
2  said there have been some claims that this whole thing
3  has been tainted and I can assure you that it's not.
4  Everything has been done by the board, by the book and
5  it's perfectly based on Vern's performance.  And so, I
6  had no inkling about any of this.  So when I'm sitting
7  at the end of the table and Eric says it, I'm thinking
8  like what, why would you feel compelled to say that.
9  That's how out of the loop I was.
10 Q.  I agree, your Honor, that would have caused some
11     questions for me, I think?
12 A.  Yeah, it was like, what.  So I know, you know, so some
13     of this stuff had already happened by the time I first
14     knew.
15 Q.  Was there more discussion at the judge's meeting once
16     Mr. Stevens said that about what he meant?
17 A.  I think Judge Pittman said yeah, I agree, that's the
18     way we always set it up or something like that.  And
19     that was kind of the end of it.
20 Q.  Okay.
21 A.  I mean, it was a proclamation.  It wasn't an attempt to
22     generate discussion.  It's just, I want everybody to
23     know that da-da-da-da.  So, at that point, I had no
24     idea about any of Eric's personal stuff.
25 Q.  But is it fair to say that maybe you found that a bit

Page 43

1  odd that Mr. Stevens just proclaimed that?
2  A.  Oh, I thought it was totally odd.
3  Q.  Okay.
4  A.  Why you would come to a meeting and deny wrongdoing
5     when, at least, Tim Hicks never suspected there was
6     wrongdoing.
7  Q.  Okay.
8  A.  It's kind of like when your kid says, you know, you
9     catch them in the kitchen and the first thing they do
10    is I didn't to it mom, one of those kind of things.
11 Q.  I've experienced that, your Honor, so I know that
12    feeling of suspicion?
13 A.  I didn't do it.
14 Q.  Ms. Vander Hyde, what did you talk with her about the
15    process for selecting Ms. Nelson?
16 A.  Just, I mean, I talked to her about the two committee
17    thing and she told me that the plan all along was to go
18    with two committees and that Lindsay got the job fair
19    and square.
20 Q.  Now, did Ms. Vander Hyde tell you anything about any
21    discussions she or any other committee member had had
22    with Mr. Stevens?
23 A.  No.
24 Q.  Okay.
25 A.  Are you a sports fan?

Page 44

1  Q.  A little, your Honor.
2         THE WITNESS:  Are you?
3         MS. BROWN:  Yes.
4         THE WITNESS:  Well, the one thing Sandra told me
5     I thought was interesting is that I felt like maybe
6     Jill and Judge Hoogstra felt that your ranking from the
7     first committee carried over into the second round and
8     like if you were fourth here, then you were fourth
9     here.  And Sandra told me that wasn't the case.  If you
10    made it through the first committee, then you went into
11    the second round free and clear without any ranking or
12    any seating.  And so, she told me that Lindsay knocked
13    it out of the park with that second group and she
14    deserved the job.
15 BY MS. HOWARD:
16 Q.  Well, you lead me to my next question, your Honor,
17    which is, did Ms. Vander Hyde tell you anything about
18    the initial intention being only advancing three
19    candidates from round one to round two and Ms. Nelson
20    not making it into the top three?
21 A.  You know, I don't recall, you know, if I looked at that
22    memo, maybe.  I actually don't recall that kind of
23    detail.  Maybe.
24 Q.  Okay.  And it, at least, has the appearance that Ms.
25    Nelson might have had a finger on the scale if only

Page 45

1  three candidates were going to be advanced and she was
2  number four, and suddenly, four get advanced to the
3  second round?
4  A.  If that is the case, yes, that certainly has a bad
5     appearance.
6  Q.  And we've established already that you were not in the
7     second round of interviews, correct?
8  A.  Or the first round.  I had nothing to do with anything.
9     I don't know who applied.  I don't know who was on the
10    committee.  When it was all happening, I didn't know
11    who was involved.
12 Q.  Do you know anything about whether Mr. Stevens had any
13    role in selecting who was on the entire committee for
14    the second round?
15 A.  Do I know if he had a role, no, I don't know if he had
16    a role.
17 Q.  Okay.  Now, Mr. Stevens was a very well liked Circuit
18    Court Administrator, would you agree?
19 A.  Yeah.
20 Q.  And in many aspects of the job he was considered
21    competent, correct?
22 A.  Yes, oh, yeah, sure.
23 Q.  Do you think that there was any way to consider the
24    candidates who were up for the job of superintendant
25    and director of the JTC, when one of those included his

Vernon Oard vs County of Muskegon, et al.
HONORABLE TIM HICKS - 11/09/2018

Page 46

1 current or former girlfriend, where he could be
2 excluded from that process in all respects?
3 MS. BROWN: Object to the form and foundation.
4 If you understand the question.
5 THE WITNESS: Do you think there was a way where
6 he could have been excluded?
7 BY MS. HOWARD:
8 Q. Right.
9 A. Sure. Well, yes, there was a way that he could have
10 been excluded, but, but at that point, I have the --
11 looking back now, if it were me, I mean, I think the
12 circumstance was so serious that I don't think you
13 could do it halfway. But like excluding him from the
14 hiring process and then have him supervise, you know,
15 so that would have -- as a manager that would have been
16 a concern.
17 Q. And Mr. Stevens did, in fact, become Ms. Nelson's
18 supervisor when he was still employed as Circuit Court
19 Administrator and she was the superintendant and
20 director of the JTC under Court jurisdiction, correct?
21 A. I think so, you know, I feel bad about giving you vague
22 answers about the JTC, but it really is kind of
23 bizarre. Because for a long time the judges didn't
24 want to have any role in supervising the Transition
25 Center when it was at White Lake, because they didn't

Page 47

1 want to be sued like they were before. There was these
2 big discussions and we had changes in county
3 administrators, we have a new building, and should the
4 Court take it back or not take it back. That's why
5 it's kind of confusing.
6 Q. Well, it's also fair to say, your Honor, that judges
7 don't have the time or the bandwidth to be involved in
8 the day-to-day operations with something like the JTC,
9 you would expect that the court administrator is going
10 to have a pretty active role in managing that
11 operation?
12 A. Bandwidth, that's kind of tough.
13 Q. Well --
14 A. I would agree that in an effective organization that
15 the judges should not be involved. You should hire
16 good people and trust them to run the show. Bandwidth?
17 Q. I didn't mean to suggest you couldn't, but?
18 A. I get it. Judges are arrogant, I get it. I've seen it
19 hundreds of times.
20 Q. That wasn't also what I was implying, your Honor?
21 A. A long time ago you mentioned my discussions about
22 other women, I think.
23 Q. Yes.
24 A. Now that you mention it, I learned during my
25 investigative part of it that Eric had been

Page 48

1 inappropriate with other statewide people, you know,
2 there was some drunken texts that he would send to
3 people, you know, there was one drunken display at a
4 Court Administrator's conference or something like
5 that.
6 Q. Is that the incident where he was seen with Ms. Nelson
7 in the hot tub?
8 A. No. I'm talking about other things beyond that.
9 Q. Oh, okay. What other types of drunken
10 inappropriateness?
11 A. Well, there was one time where the people went to the
12 lounge or the bar after the meetings were over, and he
13 was kind of all over some administrator from some other
14 county and he was like, I love you and stuff like that.
15 I think she pushed him away and that was the end of it.
16 And I think somebody else had told Sandra that she had
17 received some texts from Eric that were pretty clearly
18 sent when he was inebriated.
19 Q. That Sandra Vander Hyde had received some texts from
20 Mr. Stevens?
21 A. Sandra told me that the other -- no, that somebody in
22 the other county. Somebody -- that Susan or somebody
23 told me she had received some texts from Eric, too.
24 Q. And these were both females that Mr. Stevens had acted
25 inappropriately toward?

Page 49

1 A. Yeah. I would consider it inappropriate. There's no
2 indication that Eric did anything else with them, that
3 he engaged in a relationship with them that I knew
4 about.
5 Q. Okay.
6 MS. HOWARD: Counselor, would you like to place
7 an objection for the record?
8 MS. BROWN: I was going to place an objection to
9 foundation and form.
10 BY MS. HOWARD:
11 Q. Besides the name Susan, do you know about any other
12 names?
13 A. Susan, I'm throwing it right out there. I can't
14 remember the counties right now.
15 Q. Okay. Did Judge Hoogstra ever discuss with you her
16 concern that she had when Ms. Nelson was the program
17 director at the JTC under the County's jurisdiction
18 about what the judge testified yesterday she felt was
19 inappropriate interference by Ms. Nelson?
20 A. Interference?
21 MS. BROWN: Object to the form. Go ahead.
22 THE WITNESS: Appropriate interference with?
23 BY MS. HOWARD:
24 Q. Judge Hoogstra testified yesterday that she had a
25 concern that she asked Ms. Nelson about at her

Vernon Oard vs County of Muskegon, et al.
HONORABLE TIM HICKS - 11/09/2018

Page 50

1  interview for the superintendent job, and Judge
2  Hoogstra testified that she felt that Ms. Nelson got
3  involved with a juvenile in an order that Judge
4  Hoogstra had issued to convince the juvenile that that
5  was not in his best interest?
6  A. Judge Hoogstra and I didn't have any conversation like.
7     It was kind of the recycling of the same theme, really,
8     that, you know, Lindsay didn't deserve the job and she
9     had gotten it because of her connection with Eric.
10 Q. Okay.
11 A. How we doing on time?
12 Q. 11:10, your Honor?
13 A. We're going for an hour-and-a-half.  I would actually
14    like to take a five minute break if that's okay?
15         MS. BROWN:  Sounds great.
16         (Off the record at 11:11 a.m.)
17         (Back on the record at 11:20 p.m.)
18         MS. HOWARD:  We are back on the record.
19 BY MS. HOWARD:
20 Q. Your Honor, is it fair to say that Mr. Stevens was
21    popular and well liked during his tenure here by most
22    people?
23         MS. BROWN:  Objection.  Foundation.
24         THE WITNESS:  I had a very narrow slice.  I
25    think he was popular and well liked by the judges.  I

Page 51

1  knew him way back before he started working for the
2  Court.  He was with the Parmeter firm for awhile, I
3  think I worked with him when he was a prosecutor here,
4  so as far as I knew, he was well liked by staff.  But
5  after this, I've learned a whole bunch of otherwise.
6  But I have no contact with the AD people who work in
7  the family court.
8  BY MS. HOWARD:
9  Q. Okay.  And this is a courthouse and county system
10    employment, where it's small enough where a lot of
11    people know each other, would you agree?
12 A. I agree.
13 Q. Now, over the years were you involved at all, for
14    example, in Ms. Vander Hyde's selection as the deputy
15    court administrator?
16 A. Nope.
17 Q. Do you know who --
18 A. I wasn't really involved in the selection of Eric as
19    the deputy court administrator.
20 Q. Did Mr. Stevens select Ms. Vander Hyde as his deputy?
21         MS. BROWN:  Objection.  Foundation.
22         THE WITNESS:  I think so.
23 BY MS. HOWARD:
24 Q. Okay.
25 A. I mean, I think he consulted with judges, but he was

Page 52

1  certainly involved in the hiring of her.
2  Q. And Mr. Stevens conducted HR employment evaluations,
3     correct?
4         MS. BROWN:  Same objection.
5         THE WITNESS:  I would assume so.
6  BY MS. HOWARD:
7  Q. Okay.  And any information you would have had about her
8     job, for example, would have come primarily from Mr.
9     Stevens, correct?
10 A. Yes.  Or maybe from Judge Marietti if it was very
11    significant.
12 Q. All right.  Do you feel that -- would most of Judge
13    Marietti's information about how Ms. Vander Hyde was
14    doing on the job also have come from Mr. Stevens?
15         MS. BROWN:  Objection.  Form and foundation.
16         THE WITNESS:  I assume so.
17 BY MS. HOWARD:
18 Q. Was there any discussion in the judge's meeting after
19    Mr. Stevens resigned about posting the position for the
20    circuit court administrator job as opposed to simply
21    appointing Ms. Vander Hyde to the position?
22 A. Yes, there was some discussion.
23 Q. What was the discussion?
24 A. It was like, should we go outside and post it or should
25    we just go with Sandra, and we decided to go with

Page 53

1  Sandra.
2  Q. All right.  Did anyone oppose that plan, feel that the
3     job should be post and interviewed?
4  A. I do not remember any opposition.
5  Q. Okay.
6  A. It being verbalized to me.
7  Q. Were you in favor of just hiring Ms. Vander Hyde or
8     were you in favor of posting and interviewing for the
9     position?
10 A. I have always resisted the temptation to go for the
11    local person, because here she's familiar.  And I've
12    always insisted that we should get the best person, but
13    this time I think we did.  So I did not oppose hiring
14    her, and I did not oppose -- I did not oppose not
15    posting it.
16 Q. Okay.  Was there any discussions at the judge's
17    meetings about whether the decision to hire Ms. Nelson
18    as the permanent superintendent and director of the JTC
19    should be reopened or revisited?
20 A. I do not remember any discussion.  But remember, this
21    could have happened at the end after I left.
22 Q. After you left?
23 A. The meeting.
24 Q. Oh, the meeting?
25 A. They said okay, family court stuff and they kind of nod

Vernon Oard vs County of Muskegon, et al.
HONORABLE TIM HICKS - 11/09/2018

Page 54

1   at me and I say have a good day.
2   Q.  You're just not aware one way or the other?
3   A.  Right.
4   Q.  Okay. Were you involved at all with the hiring process
5       for the superintendent director position of the JTC to
6       replace Ms. Nelson after she resigned?
7   A.  No. Even right now I could not tell you who has that
8       job.
9   Q.  It's Mary Jo French?
10  A.  Okay.
11  Q.  Were you aware, did you hear any discussions in the
12      judge's meetings about concerns for the interview
13      process for the position after Ms. Nelson had left, any
14      discussion about how it was going to be done, how it
15      was going to be conducted, anything like that?
16  A.  I don't remember anything.
17  Q.  Okay. Were you aware that Ms. French, who is in that
18      position now, apparently, has a child with Mr. Stevens?
19  A.  Yes.
20  Q.  And when did you become aware of that?
21  A.  I think I became aware of it along ago when Judge Ruck
22      was here. He knew that and he told me. And I was very
23      surprised. I'm not sure I even believed it, but yeah,
24      I became aware of that a long time ago.
25  Q.  Okay. Do you know if he was on the selection committee

Page 55

1   for Ms. French's hiring as the superintendant and
2   director of the JTC?
3   A.  Ms. French?
4   Q.  Yeah, Mary Jo.
5   A.  Oh, Mary Jo French, I'm sorry. I got Mary Jo French
6       and Kelly France. No, I don't know.
7   Q.  Okay. Do you know if any other judges, Judge Hoogstra
8       or anyone else, wrote any memos or documented fact
9       findings with respect to Mr. Stevens' behavior or other
10      preferences for hiring as the Circuit Court
11      Administrator?
12  A.  I don't know. I haven't seen any and I haven't even
13      see any e-mails about that stuff.
14  Q.  Okay. Judge Hoogstra testified yesterday that she had
15      told Ms. Nelson, Lindsay Nelson to appear in court and
16      discuss a concern she had about juvenile cases she was
17      involved in, we were talking about it before the break,
18      and that Eric Stevens informed Ms. Hoogstra that Ms.
19      Nelson was going to be at a conference and wouldn't be
20      coming to discuss the issue with her. Did you know
21      anything about that incident?
22  A.  No.
23  Q.  Do you feel like it is -- would be appropriate for the
24      person who holds the Circuit Court Administrator job to
25      tell one of the judges they couldn't have a court

Page 56

1   employee come in and answer questions about an ongoing
2   court case?
3   A.  The way you described it, I would agree that it's
4       inappropriate.
5   Q.  Okay. And the judge has a variety of powers to make
6       anyone show up in court to answer questions about
7       things, wouldn't you agree, your Honor?
8   A.  I do.
9   Q.  A judge could issue an order for show cause, for
10      example?
11  A.  Sure.
12  Q.  Or a subpoena or some type of an order in an ongoing
13      case, if appropriate?
14  A.  True.
15  Q.  Okay.
16  A.  But in court staff I'd try to find other ways to handle
17      it.
18  Q.  Right, right. And for Mr. Stevens to have told Judge
19      Hoogstra that Ms. Nelson wasn't going to be coming to
20      answer her questions, Mr. Stevens must have perceived,
21      at least, that he had the power to oppose Judge
22      Hoogstra's request, correct?
23          MS. BROWN: Objection. Form and foundation.
24      And I think it's misstates the record. Subject to
25      that.

Page 57

1           THE WITNESS: I would agree that that was
2       inappropriate the way you've described it.
3   BY MS. HOWARD:
4   Q.  Okay. And the way I've described it, at least, Mr.
5       Stevens to have done that must have felt that he
6       wouldn't be subject to any further action once he did
7       it, correct?
8           MS. BROWN: Same objection.
9           THE WITNESS: Sounds like he felt he could,
10      yeah, he could do that without any repercussions, yes.
11  BY MS. HOWARD:
12  Q.  All right. What is your understanding of Judge
13      Pittman's administrative responsibilities as the chief
14      judge of the family court?
15  A.  He's in charge.
16  Q.  And day-to-day, what does that mean that his
17      responsibilities are?
18  A.  Well, he has everything that the statute and court
19      rules empower him to do. I don't think he's involved
20      in any sitting dockets, setting daily schedules. I
21      know that he is responsible for some management issues,
22      like who is on-call, how we manage referees, how we
23      deal with things that happen at night in the family
24      court. He manages those. I think that Judge Marietti
25      delegates a lot of the DHR stuff to him.

Vernon Oard vs County of Muskegon, et al.
HONORABLE TIM HICKS - 11/09/2018

Page 58

1  Q.  Okay.  And Judge Pittman and Eric Stevens are quite
2      close, would you agree?
3  A.  I have heard that.  I've never seen them together doing
4      anything, but I've heard that.
5  Q.  Okay.  And Judge Pittman has frequently sided with Mr.
6      Stevens on a variety of issues that have come up at
7      judge's meetings, correct?
8          MS. BROWN:  Objection.  Foundation.
9          THE WITNESS:  I, I won't say it that way.  I'd
10     say 80 percent of the stuff that we do at the judge's
11     meetings we just kind of all agree.  I can't remember a
12     time when Eric and Greg were at war, if that's what you
13     mean.
14 BY MS. HOWARD:
15 Q.  Well, I guess what I mean --
16 A.  I never have the sense that Judge Pittman was carrying
17     mail for Eric or that he was his man or that he was his
18     sponsor or his mentor.
19 Q.  Well, for example, at this judge's meeting where Mr.
20     Stevens spontaneously volunteered that the process for
21     the selecting the superintendent of the JTC was fair,
22     Judge Pittman backed him up on that, correct?
23 A.  He did.
24 Q.  And there wasn't much further discussion or issue about
25     what that meant at the judge's meeting, that was kind

Page 59

1      of the end of it, correct?
2  A.  It was.  Well, I think after Judge Pittman, somebody
3      else might have said, as far as I know, we're okay.  I
4      think Judge Marietti may have said something like that.
5  Q.  Okay.
6  A.  I learned later that Judge Hoogstra wasn't happy, but I
7      don't remember her saying much at the meeting.
8  Q.  All right.  You said you had been introduced to my
9      client, Mr. Oard, one time you think?
10 A.  I think I spontaneously met him at Subway.  There was
11     just two of us.  We were standing in line, I said
12     something about Tim Hicks and he said Vern Oard and
13     there was just something like that and we took our subs
14     and went elsewhere.
15 Q.  Is it fair to say that you didn't have much, if any,
16     interaction with him on the job?
17 A.  I agree.
18 Q.  Okay.  Were you ever interviewed or made aware of Kelly
19     France's EEOC or EEO complaint?
20 A.  Kelly France's.
21 Q.  Yes.
22 A.  No.  I knew a little bit about Jill's.
23 Q.  Okay.  Were you interviewed for Jill Stamison's EEO
24     complaints?
25 A.  No.

Page 60

1  Q.  Did you have any interaction with Kelly France when she
2      was the transition age youth manager joint position
3      between Health West and the Court?
4  A.  I don't know what job she had when.  The only
5      interaction I ever had with her was that, you know,
6      Eric's office was over here in the corner and we'd have
7      our meetings here in this room and that, and it seems
8      like almost every time I came to a meeting she was
9      working out there around the corner somewhere.  Because
10     I remember, I think I introduced myself to her maybe
11     four times.  I didn't remember her from the previous
12     one.
13 Q.  Okay.  So Kelly France was near Mr. Stevens' office at
14     least four times?
15 A.  Right.
16 Q.  When you came for judge's meeting?
17 A.  Three, four, you know.
18 Q.  Did you know anything about when Ms. Nelson left court
19     employment in May of 2014 to take a job as a clinician
20     at Health West?
21 A.  I know nothing about it.
22 Q.  All right.  Do you know or have you heard since
23     anything about the suggestion that she was moved over
24     to Health West because of her sexual relationship with
25     Mr. Stevens?

Page 61

1  A.  I know nothing about that.
2  Q.  Anything about that ever come up in your fact finding
3      in the later issues involving Mr. Stevens in 2017?
4  A.  About her move to Health West and back and things like
5      that?
6  Q.  Right.
7  A.  I don't remember that coming up.
8  Q.  Okay.  If you were able to review the memo that you
9      wrote to Judge Marietti, would that refresh your
10     recollection?
11 A.  I wrote the memo for me and him.  It might.
12 Q.  Okay.
13 A.  I don't remember getting that far back.  I remember
14     Health West with Kelly a little bit, but I don't
15     remember with Lindsay.  But if it's in the memo it's in
16     the memo.
17 Q.  Okay.  Did you do -- did you learn anything about
18     Ms. France's selection for the joint position between
19     Health West and the Court in your fact finding?
20 A.  Yes.
21 Q.  What did you learn on that topic?
22 A.  I don't know that I can remember.  Sandra would have
23     been the source of that, and during my --
24         THE WITNESS:  Answer?
25         MS. BROWN:  Nodding affirmatively.

Vernon Oard vs County of Muskegon, et al.
HONORABLE TIM HICKS - 11/09/2018

Page 62

```
1          THE WITNESS:  At my discussion with Judge
2     Marietti that was like well, can we discipline Kelly
3     France or who does she work for, who is her employer.
4     I remember that discussion.  I personally wasn't aware
5     of whose name was on her paycheck, so that came up.
6  BY MS. HOWARD:
7     Q.  And did you determine who her employer was and who
8         could discipline her?
9     A.  No.  I remember once it changed, because I think Sandra
10        came back to me and said hey, I looked it up and it was
11        this way.  It wasn't like we had thought before.
12    Q.  Do you remember, was Kelly France a Court employee or a
13        Health West employee officially?
14    A.  When?  I really don't know.
15    Q.  Okay.
16    A.  You know, for me, I knew that she seemed -- she seemed
17        -- now remember, I was pretty much only down here for
18        the judge's meetings.  I didn't spend a lot of time
19        her.  Of course, you have ostensible agency and all
20        that stuff like that, so you know, I always acted like
21        she was part of our team.
22    Q.  You say here, where we are now in the court?
23    A.  Yeah.
24    Q.  And that was an issue that you did discuss with Ms.
25        Vander Hyde when you were engaging in your fact
```

Page 63

```
1     finding?
2     A.  Kelly's, her employment status?
3     Q.  Yes.
4     A.  Yes.
5     Q.  And does your memo contain recitation of the facts that
6         you discovered that would help refresh your
7         recollection on these questions in terms of who you
8         determined her employer was, et cetera?
9          MS. BROWN:  Objection.  I'm going to renew my
10        objection that I have made with discussing the contents
11        of the memo.  Subject to that renewed objection, you
12        may respond.
13         THE WITNESS:  Now, I remember -- I'm not sure I
14        can remember the question.  Yes, looking at it would
15        certainly refresh a recollection.
16  BY MS. HOWARD:
17    Q.  Were there any other employees of the Court or of the
18        County, Health West, any other County associated agency
19        whose employment status or treatment by Mr. Stevens you
20        investigated as part of your fact finding in 2017
21        besides Ms. Nelson, Of course?
22    A.  Well, I mean, I gave you all the names I knew, so no
23        other names Ms. Nelson beyond those.
24    Q.  Okay.  Did Sandra Vander Hyde discuss with you the
25        incident in the fall of 2013 when Mr. Stevens was known
```

Page 64

```
1     to have spent the night in his room with Ms. Nelson?
2     A.  Yes.  Is this the hot tub thing up north?
3     Q.  Yes.
4     A.  Yeah.
5     Q.  And did Ms. Vander Hyde discuss with you the fact that
6         she had asked Mr. Stevens about this and he denied that
7         it -- that anything of a sexual nature or anything like
8         that had occurred?
9     A.  I'm not sure.  I thought she talked to him about this
10        stuff.  I don't remember that he denied that, because
11        it was so obvious, but I knew she talked to him about
12        stuff.  So if she said she did, I would go with that.
13    Q.  And if you had known about incidents like that in 2013
14        when they occurred, is that an incident which would
15        have, you think, caused you to you start this fact
16        finding mission earlier?
17    A.  Absolutely.  If I knew about that, I would have started
18        it right then right away.
19    Q.  Did you have any input into the decision to lay off my
20        client, Vern Oard, from his position as the director of
21        the JTC when it was under County jurisdiction?
22    A.  No.
23    Q.  Do you know who did?
24    A.  No.
25    Q.  Okay.  Was that issue ever discussed at all the
```

Page 65

```
1     judge's meetings?
2     A.  No.
3     Q.  To what extent was the, this is sort of generally
4         speaking, the topic of transitioning the JTC from
5         County jurisdiction to the Court jurisdiction discussed
6         at the monthly judge's meeting?
7     A.  I think it was discussed.  I didn't pay enough
8         attention to it.
9     Q.  Okay.  And do you remember any discussions whatsoever
10        about personnel changes or organizational charts like
11        that on the same topic when it was going to move from
12        County jurisdiction to Court jurisdiction?
13    A.  I don't remember anything in any detail.  Again, it may
14        have happened and that would be the part at the meeting
15        where I would sort of listen politely.
16    Q.  But it not really being in your silo, I would expect
17        that's not something you paid great attention to?
18    A.  Right, right.  One of the reasons I'm not chief judge.
19    Q.  You know, Judge Yates has also said to me avoiding
20        being chief judge is a past time of --
21    A.  Is a goal.
22    Q.  Yes.
23    A.  Well, the other thing is that I'm pretty heavily
24        invested in statewide stuff, you know, I'm chair of the
25        model -- I'm chair of the committee for model jury
```

Vernon Oard vs County of Muskegon, et al.
HONORABLE TIM HICKS - 11/09/2018

Page 66

1    instructions.  I teach it for the MJI.  I did some
2    stuff for the State Bar here a few weeks ago.  It's
3    always been very cooperative, you know, really, but
4    that's why I'm not a chief judge.
5  BY MS. HOWARD:
6    Q.  What is MJI, your Honor?
7    A.  Michigan Judicial Institute.  We have MJA, MJI.  That's
8        the educational end for the Court.
9    Q.  So that's the, sort of the ickle for judges, so to
10       speak?
11   A.  Yeah, yeah.
12   Q.  Has there been any discussions at judge's meetings or
13       otherwise among the judge's about Ms. France's
14       employment status over at Health West?
15   A.  Nope.
16   Q.  Have you spoken to Lindsay Nelson since she resigned
17       her employment as the JTC superintendant and director?
18   A.  No.
19   Q.  Have you spoken at all to Eric Stevens since his
20       resignation?
21   A.  No.
22   Q.  Who would make the decisions about court appointments
23       for attorneys in the family court or criminal defense
24       appointments, who does that?
25   A.  Boy, you're really wading into it now.  Criminal

Page 67

1    defense I can speak with more authority.  Our system
2    here, the judges used to make these appointments and we
3    delegated it to a chief public defender.  It was why
4    they consider one of the worst systems in the State.
5    And it violated one of the major tenants of the ADA
6    criminal justice plan, which is that judges are not
7    supposed to be involved in the selection of criminal
8    defense attorneys, so we're out of it now.  We have a
9    new public defender officer.
10         We've gone from having one of the worst systems
11   in the State to one of the best and they do all the
12   conflicts and all that stuff.  On the family division
13   side, we don't have a public defender office, so I
14   don't know, I mean, I think the judges are still
15   involved.  At the last judge's meeting there was some
16   major concern registered about one of the conflict
17   family division attorneys, who appears in front of
18   them, behavioral issues and things like that.
19   Q.  Was that Mr. Stevens?  Was that Mr. Stevens, the
20       attorney that there was concern about?
21   A.  No, no, I'm sorry.  Yeah, I forgot he was back doing
22       family work, no, it wasn't Eric.
23   Q.  So Mr. Stevens is now doing family division work as an
24       attorney in this Court, correct?
25   A.  That's what I understand.

Page 68

1    Q.  All right.  To your knowledge, is he appearing in the
2        general criminal docket as well?
3    A.  I have about twenty percent of general criminal docket.
4        I haven't seen him.
5    Q.  Okay.
6    A.  To my knowledge, nobody else has, but maybe.
7    Q.  All right.  And as far as you know, at least, the
8        family court judges are, at least, somewhat involved in
9        what attorneys receive public appointments to represent
10       clients in the family court division?
11   A.  Yes, I think so.  And in fact, I think there's some
12       kind of a local order to that effect.
13   Q.  All right.  And that local order would be issued by
14       Judge Pittman, correct?
15   A.  It was a contract, yeah, I think Judge Pittman signs it
16       for the Court.
17   Q.  Okay.
18   A.  And the only real reason I know about that is we just
19       talked about it at our judge's meeting on Wednesday.
20   Q.  And what was the discussion about the concerns of the
21       system?  What was discussed?
22   A.  Well, one particular attorney, if the judges are right,
23       is behaving very badly, and it's like what can we do
24       about it, what are our options, what should we do.
25   Q.  All right.  And I would assume that one of those

Page 69

1    options is no longer giving appointments to that
2    particular attorney?
3    A.  Assume that, yes.  But there's a contract that govern
4        some of these things.
5    Q.  Okay.  And there's a contract between the Court and the
6        group of attorneys to provide?
7    A.  I don't know who signs it on behalf of attorneys.  I
8        think the court administrator signed it.  I think Judge
9        Pittman signed it, and I don't know if that comes
10       through Fred Johnson's office or not.  Fred Johnson is
11       our chief public defender.  You know what, they do have
12       a family division, so yeah, Fred signed it.  They have
13       a family division.  It's right on the building over
14       there, public defender's office.
15   Q.  So some of those appointments might come through Mr.
16       Johnson's office now?
17   A.  Yeah.  I would think that Fred would just go ahead and
18       be able to do it, and then just he'd probably -- he
19       would just notify the Court and say hey, I've done this
20       after it's done.  I think the ADA principle applies for
21       the family division stuff.
22   Q.  When did the public defender office start here in
23       Muskegon?
24   A.  I think about 2014, 2013, maybe.
25   Q.  Okay.

Vernon Oard vs County of Muskegon, et al.
HONORABLE TIM HICKS - 11/09/2018

Page 70

1  A. Yeah, that's horrible. The public defender office does
2     the family division work, too.
3  Q. Did you participate in any interview discussion with
4     Mr. Stevens whatsoever about the issues which led to
5     his resignation in 2017?
6  A. No. From the time that I started my work, I never had
7     a one on one discussion with Eric. And I don't think I
8     had any discussion at all with him, except maybe for
9     saying something on the way out the door at night.
10 Q. Like good-bye and good luck discussion?
11 A. Well, he was -- the one I remember he was still working
12    for us, I mean, this stuff was kind of influx, but I
13    remember I know what I know, and yeah, I wasn't
14    pleased. That's why I kind of grunt and kept on
15    moving.
16         MS. HOWARD: Counsel, I think that concludes my
17    question, except we need to address the issue of the
18    memo on the record. I have some concerns given the
19    information we've been able to discuss and discover
20    about the memo that there's, at least, some parts of it
21    which would not be protected by work privilege or
22    product. I recognize the arguability of your position,
23    however, and I propose that we have it reviewed
24    in-camera by the magistrate judge assigned to this case
25    to resolve those questions. I have no desire to call

Page 71

1     back Judge Hicks after seeing the memo, but I would
2     reserve the right to do so if there was something in
3     that memo that is later released to me after an
4     in-camera review just for that limited purse. But what
5     do you think of my proposal that we submit it for
6     in-camera review?
7          MS. BROWN: I agree with that. Without -- I
8     would agree that we can submit it to Judge Green to
9     review. I'm going to maintain my objections that I've
10    made so far today. I also have some followup questions
11    that may pertain to that particular issue that I don't
12    know that we got cleared up on the record earlier.
13         MS. HOWARD: Okay.
14         MS. BROWN: But I would agree with that.
15         MS. HOWARD: Well, then I'll turn it over to you
16    for followup questions then.
17         MS. BROWN: But okay. But can we take just a
18    quick break?
19         (Off the record at 11:50 p.m.)
20         (Back on the record at 11:55 a.m.)
21         MS. BROWN: I have nothing further.
22         MS. HOWARD: All right. Well, thank you very
23    much, Judge Hicks. We appreciate it.
24         THE WITNESS: Thank you for your
25    professionalism, lady.

Page 72

1  (Deposition ended at 11:56 p.m.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 73

1  STATE OF MICHIGAN  )
                      )  ss.
2  COUNTY OF KENT     )
3       I, Shawn Breimayer, (CSR-6888) do hereby certify that the
4  foregoing deposition consisting of 73 pages, is a complete,
5  true and correct transcript of the deposition proceedings and
6  testimony of Honorable Timothy Hicks held in this case on
7  Friday, January 20, 2018; and do also certify that the
8  foregoing transcript is a true and correct transcript of my
9  stenographic notes of said deposition so reported and
10 transcribed by me.
11
    I further certify that I am neither attorney or counsel for,
12
    nor related to or employed by any of the parties to the action
13
    in which this deposition was taken; and further, that I am not
14
    a relative or employee of any attorney or counsel employed by
15
    the parties hereto, or financially interested in the action.
16
17 Dated: November 21, 2018
18
    Shawn H. Breimayer, CSR
19
    Notary Public, Ionia County, MI
20
    Acting in Kent County, MI
21
    My Commission Expires: 3-20-2020
22
23
24
25